UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREW HUNT,<br>Plaintiff,<br>v.<br>SUNRISE OPERATIONS LLC, et al.,<br>Defendants. | Case No. 23-cv-06441-SI<br><br>**ORDER RE: MOTIONS FOR SUMMARY JUDGMENT; MOTION TO EXCLUDE DR. MICHAEL MINA**<br><br>Re: Dkt. Nos. 150, 153, 154, 193 |

Before the Court are summary judgment motions filed by the parties in this religious discrimination suit. Defendant "The Pasha Group" (hereinafter, "Pasha") filed a motion for summary judgment or partial summary judgment on the basis that it is not plaintiff's employer. Defendant Sunrise Operations LLC ("Sunrise") filed a motion for summary judgment on all claims due to an absence of any factual disputes. Plaintiff filed a cross-motion for summary judgment against Sunrise, seeking to establish his prima facie case of Sunrise's failure to accommodate his religious beliefs under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. sections 2000e et seq. and the Fair Employment and Housing Act ("FEHA"), California Government Code sections 12900 et seq. Defendants also moved to exclude plaintiff's rebuttal expert, Dr. Michael Mina.

For the reasons set for below, the Court GRANTS Pasha's motion for summary judgment. Dkt. No. 150. The Court DENIES IN PART and GRANTS IN PART Sunrise's motion for summary judgment and DENIES Sunrise's motion to exclude Dr. Mina. Dkt. Nos. 153, 193. The Court GRANTS IN PART and DENIES IN PART plaintiff's cross-motion for partial summary judgment. Dkt. No. 154.

## BACKGROUND

### I. Factual Background

#### A. Plaintiff's Employment on the S.S. Horizon Pacific

Plaintiff Andrew Hunt served as an Engineer for an old container ship, the S.S. Horizon Pacific[1] since approximately 2010. Dkt. No. 61 ("TAC") ¶¶ 1, 21. In July of 2018, defendant Sunrise assigned plaintiff the position of Permanent Chief Engineer on the S.S. Horizon Pacific. Dkt. No. 150-1 ("First Washburn Decl.") ¶ 11; Dkt. No. 150-2, Ex. B. As Chief Engineer, plaintiff led the ship's engineering department of approximately 12 officers and crew to perform maintenance and repair work. Dkt. No. 153-1 ("Second Washburn Decl.") ¶ 2.[2] The S.S. Horizon Pacific's service route involved round-trip voyages from Oakland to Long Beach to Honolulu and then back to Oakland.[3] *Id.* ¶ 10.

Sunrise hires, pays, and manages the crew of four vessels, including the S.S. Horizon Pacific. Dkt. No. 150-1 ¶ 4. Each Sunrise vessel is crewed with approximately 24 employees, each of whom is a member of a maritime union. *Id.* ¶ 6. Plaintiff was a member of the engineer's union, the Marine Engineers Beneficial Association ("MEBA"). *Id.* ¶ 10; TAC ¶ 11. A collective bargaining agreement ("CBA") between MEBA and Sunrise, as amended by letters of understanding, prescribes engineers' terms of employment. *Id.* ¶¶ 7-8. Plaintiff's work was supervised by Sunrise, in accordance with its CBA with MEBA. *Id.* ¶ 13. Defendant Sunrise is a subsidiary of defendant Pasha. *Id.* ¶¶ 2-3, Dkt. No. 150-2, Ex. A. Pasha does not hire, pay, or manage any vessel crews. *Id.* ¶ 5. Pasha is not a party to any agreement for crew working on Sunrise's four vessels. *Id.* ¶ 9.

---

[1] In September 2022, the S.S. Horizon Pacific completed her last voyage before being laid up in San Diego and then towed to Texas for scrapping. Dkt. No. 153-1 ("Second Washburn Decl.") ¶ 12.

[2] Edward Washburn, the Senior Vice President of Sunrise Operations, submits two declarations in support of defendants' briefing on the motions before the Court. Dkt. Nos. 150-1, 153-1. The Court hereinafter cites to these declarations by docket number for ease of reference.

[3] While Washburn characterizes each voyage as taking 14 days round-trip (Dkt. No. 153-1 ¶ 10), plaintiff's declaration states that the voyage between California and Honolulu took 4 to 5 days each way, depending on the speed of the vessel (Dkt. No. 173-1 ¶ 21).

United States District Court
Northern District of California

**B. The Covid-19 Pandemic and CDC Guidance for Ships**

In July of 2020, the Centers for Disease Control and Prevention ("CDC") issued "Interim Guidance for Ships on Managing Suspected or Confirmed Cases of Coronavirus Disease 2019 (COVID-19)," which provided three options to ships with confirmed or suspected cases of Covid-19. Dkt. No. 153-1 ¶ 20; *see also* Dkt. No.153-5 ("Timme Decl.") ¶ 29; Dkt. No. 173-4 ("Weis Decl.") ¶ 10. CDC Option 1 was a "complete crew change out," meaning all of the ship's crew would disembark for a 14-day shoreside quarantine (if permitted by local authorities). *Id.* ¶ 21. A private company would then disinfect the ship and a new crew would embark to resume operations. *Id.* CDC Option 2 was a "working quarantine" which called for a 14-day onboard quarantine requiring social distancing, face masks, and the disinfection of the ship, and required the ship to remain close to shore for potential medical evacuations. *Id.* ¶ 25. CDC Option 3 was to "temporarily discontinue operations." *Id.* ¶ 27. This option required the ship to remain at dock, berth, or anchorage for a 14-day quarantine. *Id.* To comply with CDC guidance, the U.S. Coast Guard also issued advisories and "Captain of the Port Orders" to ships with active or suspected Covid-19 cases, including warnings that the failure to obey may be punishable with civil and criminal penalties. *Id.* ¶ 29; Timme Decl. ¶¶ 24-29, 42; Weis Decl. ¶¶ 43-44.

On September 23, 2021, the CDC issued new guidance exempting ships with "100% of crew fully vaccinated" from selecting one of the three options in the event of a Covid-19 case, and instead allowing the crew to be managed "according to CDC's guidance for fully vaccinated persons following exposure." *Id.* ¶ 16; Timme Decl. ¶ 52. The September 23, 2021 CDC update also modified CDC Option 1, "crew change outs" for ships without 100% fully vaccinated crews, such that a ship's "complete" crew was no longer required to be changed out in the event of a case of Covid-19 under CDC Option 1, only any unvaccinated crewmembers. Weis Decl. ¶¶ 15-16.

**C. Sunrise's Covid-19 Vaccination Policies**

On May 17, 2021, after the Covid-19 vaccination became available, Sunrise created a Covid-19 vaccination incentive program offering a $200.00 bonus to each crew member with proof of full vaccination. Dkt. No. 150-1 ¶ 15; Dkt. No. 150-2, Ex. C. On October 25, 2021, Edward Washburn,

Sunrise's 30(b)(6) designee and Senior Vice President of Operations at Sunrise, signed a draft Letter of Understanding ("LOU") between MEBA and Sunrise (the "Company") that required MEBA's members employed on Sunrise vessels to be fully vaccinated against Covid-19 or to have received a medical or religious exemption, in order to be considered fit for duty. *Id.* ¶¶ 17-18; Dkt. No. 150-2, Ex. D. That LOU provides that "[r]equests for religious exemptions will be handled between the Union and the Company on a case-by-case basis." *Id.* ¶ 17, Ex. D.[4]

**D. Pasha's Covid-19 Strategic Response Team & Vaccination Policies**

On March 17, 2020, the day after counties in the Bay Area began issuing shelter in place orders in response to the Covid-19 pandemic, Pasha prepared a memorandum, produced to plaintiff in discovery. Dkt. No. 195-1 ("McCullough Decl.") ¶ 5. The memorandum notified "all Employees of The Pasha Group family of companies" that a "Strategic Response Team" had been established to provide "situational updates" and to ensure that employees could "perform their day to day job activities." Dkt. No. 195-2, Ex. A; Dkt. No. 192-2 ("Irvine Depo.") at 26:12-20, 28:17-29:7.[5] The memorandum stated that the Strategic Response Team was composed of "Chris Irvine - HR", employees of Pasha's subsidiaries including "Chris Hamlin - Pasha Hawaii/PAS", "Mike Caswell - PST/HIS", "Edward Washburn - Pasha Hawaii/ Vessel", and others. *Id.*; *see also* Dkt. No. 192-2 at 27:10-13; 46:12-49:4.

The Strategic Response Team met weekly beginning in March 2020, but meeting frequency tapered to monthly towards the end of 2020. Dkt. No. 192-2 at 27:20-28:22. Washburn testified that he does not think he attended any Strategic Response Team meetings. Dkt. No. 195-5 ("Washburn Depo.") at 133:11-17. Christine Irvine testified that she did not recall if Washburn attended any of these meetings but thinks "he was not there." Dkt. No. 195-3 ("Irvine Depo.") at

---

[4] Pasha is not a party to the LOU. *Id.* ¶ 19.

[5] Parties submit overlapping and distinct portions of the deposition transcripts of Pasha's 30(b)(6) designee Christine Irvine and Sunrise's 30(b)(6) designee Edward Washburn. Plaintiff deposed Irvine four times: on December 17, 2025; May 7, 2026; May 13, 2026; and May 27, 2026, and plaintiff deposed Washburn three times: on April 14, 2026; April 15, 2026, and May 27, 2026. McCullough Decl. ¶¶ 11-12. For ease of reference, the Court refers to each of these deposition transcripts by docket number.

30:17-21, 37:16-18. The Strategic Response Team discussed whether to mandate vaccination for Covid-19 and the need for 100% compliance. Dkt. No. 192-2 at 31:13-34:25. Pasha's Executive Team subsequently met to discuss a Covid-19 vaccination policy. *Id.* at 82:10-83:10. The Strategic Response Team never discussed whether to allow religious exemptions to the vaccination requirement and did not review employees' requests for exemptions. *Id.* at 31:4-12, 44:1-14.

In September 2021, "on behalf of the Pasha Group Executive Team" Irvine issued a memorandum to "Pasha employees" requiring "all employees, including remote employees, to provide proof of vaccination or receive qualified [religious or medical] exemptions as a condition of continued employment." Dkt. No. 150-1 ¶ 28; Dkt. No. 150-2, Ex. F. The second page of the memorandum states that Pasha's "[p]olicy requires all non-bargaining employees, including remote employees" to provide proof of vaccination or receive qualified exemptions. Dkt. No. 150-2, Ex. F. It is undisputed that Pasha's September 2021 policy applied only to "non-union employees" of Pasha and its subsidiary companies, and therefore did not apply to Sunrise union employees or to plaintiff. Dkt. No. 150-1 ¶ 28; Dkt. No. 192-2 at 50:7-8.[6]

### E. Plaintiff's Request for Religious Exemption & Meetings with Washburn

On November 5, 2021, plaintiff emailed Washburn, Claudia Cimini (a MEBA union representative), and others a request for religious exemption from the LOU's Covid-19 vaccination requirement. Dkt. No. 154-4 at 18-36 (ECF pagination); Dkt. No. 154-2 ("Washburn Depo.") at 215:15-20; Dkt. No. 173-1 ("Hunt Decl.") ¶ 3. In that request, plaintiff stated that, as a Christian, he strongly opposes abortion and must avoid intentionally contaminating his body with synthetic genetic material. *Id.*

On November 9, 2021, Captain Greg Johnson, Fleet Superintendent, with approval from Washburn, responded to plaintiff's request for religious exemption in an email on Sunrise letterhead. Dkt. No. 154-4 at 37-38 (ECF pagination); Dkt. No. 154-2 at 222:24-39. As SVP of Sunrise,

---

[6] At the hearing on August 14, 2026, counsel for plaintiff confirmed plaintiff does not dispute Pasha's policy applied only to non-union employees.

United States District Court
Northern District of California

Washburn made the decision to deny plaintiff's request for religious exemption. Dkt. No. 150-1 ¶ 30. The November 9, 2021 letter stated in relevant part:

> We have reviewed your request for a religious exemption . . . We recognize that you have sincerely held religious beliefs that you feel would be violated were you to get a vaccine for COVID 19.
>
> Although Sunrise is willing to provide you with an accommodation on the basis of your sincerely held religious beliefs, our options to grant such an exemption are restricted by the close quarters of the shipboard living and working environment, as well as limited access to medical care while a vessel is underway. The company further recognizes that allowing non-vaccinated crew to continue to sail aboard our ships puts the other crewmembers at undue risk. . . .
>
> Should you fail to be fully vaccinated by December 31, 2021, you will lose your position as a permanent officer and you will no longer be eligible to sail on vessels crewed by Sunrise Operations LLC.

*Id.* After receiving the letter, plaintiff had a conversation with MEBA to discuss his request for religious exemption, and Cimini arranged a meeting with Washburn to discuss possible religious accommodations. Hunt Decl. ¶¶ 4, 5.

On December 8, 2021, plaintiff met with Cimini and Washburn to discuss plaintiff's request for a religious exemption and possible accommodations. *Id.* According to plaintiff, Washburn began that meeting by stating that no accommodations would be considered. Dkt. No. 174-7, Ex. 7 ("Hunt Depo.") at 242:22-25; Hunt. Decl. ¶ 6. Plaintiff and Cimini both testified that Washburn told plaintiff that he "hoped Mr. Hunt would change his religious beliefs." Dkt. No. 174 ("Cherne Decl.") ¶¶ 7, 9; Dkt. No. 210-2, Ex. 9 ("Cimini Depo.") at 140:1-13; Hunt Depo. at 213:4-6. Plaintiff testified that Washburn's facial expression when he made the comment was "kind of shocking" and "like someone trying to hide a smirk." Hunt Depo. at 211:6-212:14; Hunt Decl. ¶ 8. Cimini testified that she "was stunned" because the comment was "inappropriate" and she "couldn't believe he said it." Cimini Depo. at 140:6-13. Cimini testified that she asked Washburn, "What are you saying?" but could not recall Washburn's response. *Id.* Plaintiff also testified that Washburn repeated that he hoped plaintiff would change his religious beliefs at a second meeting on December 20, 2021. Hunt Depo. at 256:10-12, 257:1-9. Washburn declined to consider the accommodation proposals like testing, masking, or distancing suggested by plaintiff. Hunt Decl. ¶ 10.

During oral argument, counsel for Sunrise clarified that there is a factual dispute as to whether Washburn said that he hoped plaintiff would change his religion. According to Sunrise, Washburn actually stated that he hoped plaintiff would change his mind. Washburn testified during his deposition: "we liked Andrew Hunt. He was an excellent engineer. I wanted him back. I told him, many times, I hope he changes his mind." Dkt. No. 170-3 ("Washburn Depo.") at 226:10-13.

### G. Denial of Accommodations & Unfit for Duty Determination

The parties characterize the subsequent events somewhat differently. According to plaintiff, he was terminated as of December 31, 2021, consistent with the November 9, 2021 letter and what Washburn told plaintiff at the December 20, 2021 meeting. Hunt Decl. ¶ 12; *see also* Dkt. No. 174-5 ("Johnson Depo.") at 152:9-12 ("Q: And so did the company remove him from his permanent position as of December 31, 2021? A: I believe so. Or we just didn't request him to come back to the vessel."). Plaintiff declares that on December 21, 2021, plaintiff emailed Washburn, Johnson, and others, confirming that he would be fired as of December 31, 2021 if he did not get vaccinated, and he received no reply. Hunt Decl. ¶ 13.

According to Washburn, Hunt was "offered a leave of absence as an accommodation in response to his request for an exemption" and then resigned in January 2022 when Hunt took a job working for another vessel operator. Dkt. No. 153-1 ¶ 3; *see also* Dkt. No. 170-3 at 32:1-35:7. On December 20, 2021, Washburn sent an email to Johnson and others stating "[Hunt] is unfortunately giving up his position. He cannot return unvaccinated." Dkt. No. 174-4 at 42 (ECF pagination).

It is undisputed that on February 7, 2022, Washburn sent plaintiff a formal notice on Sunrise letterhead finding him "unfit for duty." *Id.*; Dkt. No. 150-2, Ex. E. That letter states, in relevant part,

> Sunrise Operations LLC has considered your email dated December 1, 2021 . . .
>
> We understand that you have offered to be tested before you get on the vessel and to stay aboard throughout your rotation. Test results are not always accurate . . . The accommodation of allowing you to serve onboard unvaccinated would pose a direct threat to all of the other members of the crew who will have an increased risk of contracting the virus and would not have access to medical help while underway. Additionally the accommodating of an unvaccinated

> person in close quarters on ships would put the company under undue hardship because of the increased risk of infection or spreading of the virus from an unvaccinated person and the resultant disruption of vessel operations and the flow of goods to Hawaii.
>
> The company's policy, as agreed by the union in the LOU, will apply to you and since you are not vaccinated against COVID, you are unfit for duty.

*Id.* Plaintiff characterizes this letter as "a mere formality" and declares that he was actually terminated at the end of December. Hunt Decl. ¶ 14.

Plaintiff's request was the only request for a religious exemption from the Covid-19 vaccination requirement in the LOU with MEBA that Sunrise received. Dkt. No. 150-1 ¶ 29.[7] Sunrise received no requests for medical exemptions. *Id.* ¶ 29.

## II. Procedural Background

Plaintiff filed this lawsuit in December 2023. Dkt. No. 1. On October 25, 2024, plaintiff filed the Third Amended Complaint ("TAC"), which is now the operative complaint. *See* Dkt. No. 61. The TAC asserts seven claims for relief under both federal and state law. On November 8, 2024, defendants Sunrise and Pasha answered the TAC. *See* Dkt. Nos. 64, 65. A third defendant, plaintiff's union, MEBA, answered the TAC on January 22, 2025, after the Court denied the union's motion to dismiss. *See* Dkt. Nos. 70, 71. MEBA has since settled with plaintiff and is no longer in this case. Dkt. Nos. 93, 96. Following numerous extensions of the pretrial deadlines, the Court set a deadline of May 15, 2026, for the filing of dispositive motions.

On May 4, 2026, defendants moved for judgment on the pleadings as to plaintiff's fourth claim for "Religious Coercion – Harassment" under Title VII. Dkt. No. 149. The Court denied defendants' motion on July 17, 2026. Dkt. No. 203.

Defendants Sunrise and Pasha have each filed motions for summary judgment. Dkt. Nos. 152, 153. Plaintiff has filed a cross-motion for partial summary judgment, seeking to establish his prima facie case for his second and sixth claims for "Religious Discrimination – Failure to Accommodate" under Title VII and FEHA, as to defendant Sunrise. Dkt. No. 154. Defendants

---

[7] Sunrise also received one other religious exemption request from a non-MEBA employee not governed by the LOU. *See* Dkt. No. 173-4 ¶ 36.

have also filed a motion to exclude plaintiff's rebuttal expert Dr. Michael Mina. Dkt. No. 193. The motions are fully briefed. *See* Dkt. Nos. 170, 173, 191, 192, 195, 196, 206, 212.

**LEGAL STANDARD**

**I. Expert Testimony**

Federal Rule of Evidence 702 permits the introduction of expert testimony only if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. "To qualify as an expert, a witness must have 'knowledge, skill, experience, training, or education' relevant to such evidence or fact in issue." *U.S. v. Chang*, 207 F.3d 1169, 1172 (9th Cir. 2000) (citing Fed. R. Evid. 702). Expert testimony is admissible "only if it is both relevant and reliable." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).

The proponent of the expert testimony has the burden of proving the proposed expert testimony is admissible. *Lust ex rel. Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996). On December 1, 2023, Rule 702(d) was amended to "clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule." Fed. R. Evid. 702 (Adv. Comm. Note, 2023). However, Rule 702 "should be applied with a 'liberal thrust' favoring admission." *Messick v. Novartis Pharm. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588 (1993)). "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010).

Rule 702 requires that the trial court act as a "gatekeeper" by "making a preliminary determination that the expert's testimony is reliable." *Elsayed Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1063 (9th Cir. 2002) (citations omitted); *see Daubert*, 509 U.S. at 597. The decision whether to admit or exclude expert testimony lies within the trial court's discretion.

*See General Elec. Co. v. Joiner*, 522 U.S. 136, 141-42 (1997); *United States v. Calderon-Segura*, 512 F.3d 1104, 1109 (9th Cir. 2008). Additionally, Rule 702 "makes no relevant distinction between 'scientific' knowledge and 'technical' or 'other specialized' knowledge." *Kumho Tire*, 526 U.S. at 147.

## II. Summary Judgment

Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party, however, has no burden to disprove matters on which the non-moving party will have the burden of proof at trial. The moving party need only demonstrate to the Court that there is an absence of evidence to support the non-moving party's case. *Id.* at 325.

Once the moving party has met its burden, the burden shifts to the non-moving party to "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting then Fed. R. Civ. P. 56(e)). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

In deciding a summary judgment motion, the Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Id.* at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment. . . ." *Id.* However, conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. Gen. Tel.*

United States District Court
Northern District of California

*& Elec. Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). The evidence the parties present must be admissible. Fed. R. Civ. P. 56(c).

When considering cross-motions for summary judgment, the Court must review each motion "on its own merits." *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (internal quotation marks and citation omitted). The Court must consider the evidence presented in support of each motion "to determine whether it present[s] a disputed issue of material fact precluding summary judgment" on the other motion. *Id.* at 1135. In other words, the Court collectively considers all of the evidence presented, then decides each motion for summary judgment separately based on the sum of the evidence.

## DISCUSSION

### I. Defendants' Motion to Exclude Plaintiff's Expert Dr. Michael Mina

Defendants Sunrise and Pasha move to exclude plaintiff's expert Dr. Michael Mina under Federal Rule of Civil Procedure 37, Federal Rules of Evidence 702 & 703[8], and *Daubert*, 509 U.S. 579 (1993). Dkt. No. 193. The Court addresses this motion at the outset because defendants also argue that the Court should disregard Dr. Mina's declaration submitted in support of plaintiff's opposition to Sunrise's motion for summary judgment (Dkt. No. 173-3). For the reasons set forth below, the Court DENIES defendants' motion.

#### A. Plaintiff's Objection

On May 5, 2025, plaintiff's Settlement Conference Statement served on defendants' counsel apparently stated "Plaintiff will produce expert testimony of Michael Mina, M.D., Ph.D., the nation's foremost expert on vaccine testing, who is expected to testify … The Defendant's vaccine

[8] Rule 703 provides, "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect." Fed. R. Civ. P. 703.

mandate was not science based." Dkt. No. 193 at 1. Plaintiff objects to defendants' disclosure of plaintiff's confidential settlement brief under ADR Local Rule 7-4(a).[9] Dkt. No. 206 at 2. Defendants argue that their citation to plaintiff's Settlement Conference Statement was not improper, largely because it did not attach plaintiff's actual statement to the motion. Dkt. No. 212. Defendants further state that, even if the quotation was improper, the Court should still take notice of the undisputed fact that Dr. Mina has been retained for over a year. The Court agrees that defendants' quotation from a confidential settlement brief was improper under ADR Local Rule 7-4(a) and sustains plaintiff's objection.

**B. Expert Disclosures and Opinions**

Plaintiff's June 1, 2026, expert disclosure did not include Dr. Michael Mina. Dkt. No. 193-2, Ex. A (Plaintiff's Expert Disclosure). Defendants' June 1, 2026 disclosures designated Dr. Brian Bourgeois and U.S. Coast Guard Rear Admiral Timme as retained experts. Dkt. No. 193-3, Ex. B (Defendants' Expert Disclosure). On June 15, 2026, plaintiff filed his opposition to Sunrise's motion for summary judgment, which included Dr. Michael Mina's 33-page declaration. Dkt. No. 173-3 ("Mina Decl."). On July 1, 2026, plaintiff served defense counsel with his rebuttal expert designation, including Dr. Mina, "an expert in Infectious Disease Immunology." Dkt. No. 193-4, Ex. C (Plaintiff's Rebuttal Expert Disclosure).

**Dr. Bourgeois's Opinions:** Dr. Bourgeois is a medical doctor and CEO and Medical Director of Offshore Medical Logistics who has provided medical guidance to mariners for 25 years and is therefore familiar with medical emergencies at sea and shipboard logistics. Dkt. No. 193-3, Ex. D-1. Dr. Bourgeois opines as to the heightened risks of Covid-19 for mariners who live and

[9] ADR Local Rule 7-4(a) states, "[e]xcept as provided by a case-specific order entered in advance of the settlement conference or in subdivision (b) of this local rule, this Court, the settlement Judge, all counsel and parties, and any other persons attending the settlement conference shall treat as 'confidential information' the contents of any written settlement conference statements, anything that was said, any position taken, and any view of the merits of the case expressed by any participant in connection with any settlement conference. 'Confidential information' shall not be: (1) Disclosed to anyone not involved in the litigation (2) Disclosed to the assigned Judge; or (3) Used for any purpose, including impeachment, in any pending or future proceeding in this Court. ADR Local Rule 7-4(b) provides limited exceptions to confidentiality, none of which apply here.

United States District Court
Northern District of California

work in a finite space. *Id.*, Ex. D-2. Further, Dr. Bourgeois opines that the requirement for all onboard personnel to be vaccinated against Covid-19 was reasonable and judicious. *Id.*

**Admiral Timme's Opinions:** Admiral Timme is a retired U.S. Coast Guard Rear Admiral with over 30 years of experience in maritime safety and security who provides expert services to the maritime community. Dkt. No. 193-3, Ex. B-1. Admiral Timme provides opinions on the Coast Guard's response to the Covid-19 pandemic and specifically on Captain of the Port Orders issued to comply with CDC guidelines to control the spread of Covid-19 on ships. *Id.*, Ex. B-2. Admiral Timme opines as to the difficulties ships faced complying with each of the CDC's three options for ships without 100% vaccinated crews (crew change out, working quarantine, or temporarily discontinuing operations). Specifically, Admiral Timme opines that by December 2021 the presence of a Covid-positive crew member on a vessel without a 100% vaccinated crew was an "operational catastrophe." *Id.*

**Dr. Mina's Rebuttal Opinions:** Dr. Mina is a physician and public health expert who specializes in epidemiology. Dkt. No. 193-4. Dr. Mina acknowledges that in late 2021 vaccination remained important and states that his opinions "should not be understood as minimizing the benefits of vaccination or the seriousness of COVID-19." *Id.* at 5-6. He opines on why vaccination status alone was not a reliable proxy for infectiousness, and why testing and layered mitigation were scientifically relevant to the risk of Covid-19. *Id.* Dr. Mina also provides limited opinions applying his epidemiology opinions to the context of a ship based on his review of this case. *Id.* Dr. Mina opines that allowing plaintiff to remain unvaccinated but subjecting him to pre-boarding testing, day-of-testing, masking, eating in his stateroom, and other mitigation efforts would have reduced plaintiff's transmission risk to a level comparable to, and most likely lower than, vaccinated but untested crew members who were not subject to the same restrictions. *Id.*

### C. FRCP 37(c)(1)

Defendants argue that Dr. Mina should be excluded under Federal Rule of Civil Procedure 37(c)(1) because his opinions go beyond the scope of a rebuttal expert and he was therefore required to be designated in plaintiff's original Rule 26(a)(2) designation. Dkt. No. 193 at 4-9. Defendants

argue that plaintiff is intentionally sandbagging them by withholding Dr. Mina's report until after Sunrise filed its motion for summary judgment.

Rule 26 requires a party to disclose the identities of any expert witnesses it may use at trial, and provide their written reports, at the time and in the sequence that the court orders. *See* Fed. R. Civ. P. 26(a)(2)(A)(B) & (D). Rule 26 also provides for the submission of rebuttal expert reports within 30 days after the other party's initial disclosure, "if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 23(A)(B), or (C)." Fed. R. Civ. P. 26(a)(2)(D)(ii). Under Rule 37(c)(1), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

The Court has reviewed the expert reports and declarations of Dr. Bourgeois, Admiral Timme, and Dr. Mina. Dr. Mina's opinions go into considerable depth about Covid-19 and the Covid-19 vaccination. But Dr. Mina's expert report still generally contradicts or rebuts evidence and opinion provided by Dr. Bourgeois and Admiral Timme. Specifically, Dr. Mina refutes defendants' expert testimony that supports defendants' undue hardship affirmative defense. The Court finds that even if Dr. Mina should have been disclosed earlier, any failure to disclose was harmless because defendants still can still depose him prior to trial and because defendants' more limited requests in the alternative are available to cure any prejudice.[10] Moreover, any failure to disclose Dr. Mina prior to briefing the summary judgment motions was harmless because the Court's undue burden analysis would be the same even if Dr. Mina's report more narrowly responded to the opinions presented by Dr. Bourgeois and Admiral Timme.

[10] Defendants request that, in the alternative, the Court (1) exclude Dr. Mina from plaintiff's case in chief, (2) only allow Dr. Mina to testify after defendants' experts have testified, (3) strictly limit Dr. Mina to rebutting specific testimony of defendants' experts, and (4) hold an evidentiary/ *Daubert* hearing outside of the presence of the jury to determine the admissibility of his rebuttal opinions before he is allowed to testify. Dkt. No. 212 at 10.

United States District Court
Northern District of California

**D. Rules 702, 703, and *Daubert***

Defendants also argue that Dr. Mina is unqualified under Federal Rule of Evidence 702 to render opinions on the shipping industry and its response to the Covid-19 pandemic. Dkt. No. 193 at 9-10. The Court agrees to the extent Dr. Mina does not have the training or knowledge to opine on maritime standards, vessel command, Coast Guard enforcement, or how Sunrise should have operated its vessel. But as plaintiff points out, Dr. Mina does not attempt to do so. *See* Dkt. No. 206 at 4. Many of Dr. Mina's opinions applying his knowledge of Covid-19 to the shipping industry are quite general. To the extent Dr. Mina intends to testify beyond his immunology expertise, defendants can object to specific questions at trial and test his qualifications on cross-examination.

Finally, defendants contend that Dr. Mina's opinions are not relevant, helpful, or reliable under Federal Rules of Evidence 702, 703, and *Daubert*. Dkt. No. 193. Defendants rely almost exclusively on several unpublished district of Oregon cases decided by the same judge on the same day based on identical reasoning, striking Dr. Mina's testimony as irrelevant and because his opinions were not the product of reliable scientific methodology. *See Berra v. PeaceHealth,* No. 6:22-CV-00219-AA, 2026 WL 1509010, at *5-14 (D. Or. May 31, 2026); *Salinas Navarrete v. PeaceHealth*, No. 6:22-CV-00181-AA, 2026 WL 1509008, at *5-14 (D. Or. May 31, 2026); *Trimmier v. PeaceHealth*, No. 6:22-CV-00243-AA, 2026 WL 1509009, at *5-14 (D. Or. May 31, 2026); *Hunter v. PeaceHealth*, No. 6:22-CV-00187-AA, 2026 WL 1509007, at *5-14 (D. Or. May 31, 2026). However, one of the primary issues that the Oregon district court identified with Dr. Mina's report in these cases was that it relied on authorities not available to the defendant when it considered the plaintiffs' requests for religious accommodation. *See id.* Dr. Mina's report in this case is distinguishable because almost all of the authorities Dr. Mina's report cites appear to have existed before December 31, 2021, when plaintiff alleges he was terminated. Dkt. No. 193-4; *see* Opp'n at 16. Thus, the Court finds that Dr. Mina's opinions are relevant.

The Oregon district court also noted that Dr. Mina's opinions regarding the Covid-19 vaccination changed significantly after he left his position at Harvard in 2021 to take positions at biomedical and pharmaceutical device companies. To the extent that is the case, credibility determinations are fodder for cross examination and the Court finds that Dr. Mina's testimony is

sufficiently reliable such that it may be helpful to the jury. *See Primiano v. Cook*, 598 F.3d at 564 ("Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion.").

Accordingly, the Court DENIES defendants' motion to exclude Dr. Mina without prejudice to raising objections to specific questions that go outside the scope of his immunology expertise or beyond his role as a rebuttal expert, at the time of trial. With this said, Dr. Mina may not testify during plaintiff's case in chief, may testify only after defendants' experts, and must confine his testimony to rebutting opinions offered by defendants' retained experts. The Court considers Dr. Mina's declaration, submitted in support of plaintiff's opposition to Sunrise's motion for summary judgment, while taking defendants' arguments into consideration as to whether Dr. Mina's declaration creates a triable issue of fact.

## II. Evidentiary Objections

### A. Plaintiff's Objection to Edward Washburn's Declaration

Plaintiff objects to paragraphs 19, 21, 23, 27, 28, 29 and 30 of the Washburn declaration (Dkt. No. 150-1) as lacking foundation to demonstrate Washburn's personal knowledge of all communications and decisions by Pasha executives and as improper legal conclusions regarding defendants' employer status. Dkt. No. 192 at 2. "At the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003). Because the contents of the Washburn declaration could be admissible at trial, the Court overrules plaintiff's objection but takes into consideration plaintiff's evidence that contradicts the contested paragraphs.

### B. Plaintiff's Objection to the Timme Declaration

Plaintiff objects to paragraphs 30-42 and 48-52 of the Timme Declaration on the grounds that these opinions exceed his disclosed expertise and lack foundation under Federal Rules of Evidence 602 and 702. Dkt. No. 173 at 1-2. Sunrise argues that plaintiff's objections to Admiral

United States District Court
Northern District of California

Timme's expert opinion go to weight not admissibility. Dkt. No. 196 at 12. The Court agrees with Sunrise and overrules plaintiff's objection.

**C. Plaintiff's Objection to Sunrise's Reply Evidence**

Plaintiff objects to the declaration of Juliette B. McCullough (Dkt. No. 196-1) and the expert report of retained forensic accountant Henry Kahrs (Dkt. No. 196-2) on the grounds that Sunrise improperly submitted new evidence for the first time with its reply brief to its motion for summary judgment. Dkt. No. 201. "While a court need not consider evidence submitted for the first time in a reply, it may consider evidence and argument submitted with a reply that is *responsive* to arguments raised in the non-moving party's brief in opposition." *Cho v. CG Invites Co.,* No. 24-CV-07112-WHO, 2025 WL 3493564, at *4 (N.D. Cal. Dec. 4, 2025) (quoting *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) and *Ejonga v. Strange*, No. 2:21-cv-01004-RJB-GJL, 2023 WL 4457142, at *1 (W.D. Wash. July 11, 2023)). Here, the evidence Sunrise submitted in reply is directly responsive to plaintiff's argument that Sunrise identifies "no actual amount of financial cost it would have incurred had it accommodated Hunt." Dkt. No. 173 at 19. Therefore, the Court overrules plaintiff's objection.

**D. Pasha's Objection to the Molinaro Declaration**

Plaintiff's opposition briefs (Dkt. Nos. 173, 192) to defendants' motions for summary judgment rely in part on the declaration of Ryan Molinaro (Dkt. No. 172). Molinaro declares that he was employed by Pasha as Vice President of Automotive and was terminated for not complying with Pasha's Covid-19 vaccination requirement. Dkt. No. 172. Molinaro declares: "Senior VP Chris Hamlin told me over the phone that the company CEO George Pasha was not going to approve any exemption requests. Mr. Hamlin further told me that George Pasha didn't want anyone around him who was not vaccinated. Further stated Pasha will only honor a religious exemption from Christian Scientists." *Id.*

Pasha argues that the Molinaro declaration is inadmissible and should be disregarded by the Court. Dkt. No. 195 at 2. Pasha objects that the declaration is dated June 3, 2025 (over a year ago),

United States District Court
Northern District of California

is not authenticated, and does not identify whether it was given for this case or in any litigation. *Id.* at 2. Pasha also objects that the statements attributed to Chris Hamlin about George Pasha's beliefs are inadmissible because they constitute double (or triple hearsay) and lack foundation. *Id.* Finally, Pasha objects that plaintiff did not disclose Ryan Molinaro until May 8, 2026 in a supplemental disclosure, in which plaintiff claimed not to have any contact information for Ryan Molinaro, and therefore Pasha has not had a reasonable opportunity to contact and depose him. *Id.*

When asked by the Court about this declaration at the hearing, counsel for plaintiff stated that the Molinaro declaration was obtained from an attorney who had a different case against Pasha. Declarations filed in connection with another case can be used to support a motion for summary judgment. *See Campbell v. Nat'l Passenger R. Corp.*, No. C05-05434 MJJ, 2008 WL 930992, at *14-15 (N.D. Cal. Apr. 3, 2008) (overruling evidentiary objection). However, under Rule 56, an "affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

The Court agrees with Pasha that this declaration improperly attests to George Pasha's state of mind without laying any foundation for how Ryan Molinaro or Chris Hamlin apparently learned of George Pasha's beliefs. The Court sustains Pasha's objection and does not consider Molinaro's declaration to be relevant in ruling on defendants' motions for summary judgment. *See* "[C]onclusory, self-serving affidavit[s], lacking detailed facts and any supporting evidence," are insufficient to create a genuine issue of material fact. *FTC v. Publ'g Clearing House, Inc.,* 104 F.3d 1168, 1171 (9th Cir.1997).

### E. Sunrise's Request that the Court Disregard Miscited Facts

In Sunrise's reply brief to its motion for summary judgment, Sunrise highlights that plaintiff miscited deposition testimony and asks the Court to disregard any miscited facts. Dkt. No. 196 at 10-11. The Court notes that both plaintiff and Sunrise made clerical errors, which made the evidence more difficult to parse through. *See, e.g,* errata, Dkt. Nos. 214, 209, 205. Counsel for Sunrise and plaintiff explained these errors when questioned by the Court at the hearing and confirmed they

were not the result of artificial intelligence. The Court overrules Sunrise's request. If parties plan to proceed to trial, the Court admonishes that filings must be more organized.

**III. Claims I & V: Religious Discrimination – Disparate Treatment (Title VII and FEHA)**

Sunrise moves for summary judgment on plaintiff's first and fifth claims for "Religious Discrimination – Disparate Treatment" under Title VII and FEHA. Dkt. No. 155 at 14-16. Plaintiff's first and fifth claims specifically allege that Sunrise "subjected him to adverse employment actions by threatening to terminate his employment if he did not change his religious beliefs" and by terminating Hunt's employment "because of his religion." TAC ¶¶ 68, 69, 119, 120.

Sunrise argues that the LOU requiring plaintiff to be vaccinated was a facially neutral vaccine mandate that applied equally to all Sunrise employees who were members of plaintiff's union regardless of their religion. Dkt. No. 155. at 14-15. Sunrise contends that plaintiff has not shown that Sunrise's policy requiring Covid-19 vaccinations was motivated by any discriminatory intent or was pretext for discrimination. *Id.* at 15. Further, Sunrise asserts that plaintiff has failed to provide evidence that any other members of his union governed by the LOU continued to work on Sunrise vessels while unvaccinated. *Id.* at 15-16.

Disparate treatment occurs "where an employer has treated a particular person less favorably than others because of a protected trait." *Ricci v. DeStefano*, 557 U.S. 557, 577 (2005). "A disparate-treatment plaintiff must establish that the defendant had a discriminatory intent or motive for taking a job-related action." *Id.* "[W]hen responding to a summary judgment motion," a Title VII[11] plaintiff "is presented with a choice regarding how to establish his or her case." *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004).

Under the first path, the plaintiff may "simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated" the employer and that

[11] The same legal standards apply to disparate treatment claims brought under Title VII and FEHA. *See Godwin v. Hunt Wesson*, 150 F.3d 1217, 1219 (9th Cir. 1998) ("Because California law under the FEHA mirrors federal law under Title VII, federal cases are instructive."), citing *Bradley v. Harcourt, Brace and Co.,* 104 F.3d 267, 271 (9th Cir. 1996) ("California relies on federal discrimination decisions to interpret the FEHA.").

the employer's actions adversely affected plaintiff in some way. *Id.* Alternatively, the plaintiff may rely on the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). A plaintiff alleging disparate treatment makes out a prima facie case under *McDonnell Douglas* by showing: (1) he is a member of a protected class; (2) he was qualified for his position; (3) he experienced an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably or other circumstances surrounding the adverse employment action give rise to an inference of discrimination. *Id.* at 1155; *see also Lui v. DeDoy*, 129 F.4th 770, 778 (9th Cir. 2025) (clarifying that "the fourth element of the *McDonnell-Douglas* prima facie test . . . requir[es] only that the adverse action occurred under circumstances giving rise to an inference of discrimination." (cleaned up)). At summary judgment, the degree of proof necessary to establish a prima facie case is "minimal and does not even need to rise to the level of a preponderance of the evidence." *Lyons v. England*, 307 F.3d 1092, 1112 (9th Cir. 2002) (internal quotation marks and citation omitted); *see also Opara v. Yellen*, 57 F.4th 709, 723-24 (9th Cir. 2023). If the plaintiff makes out a prima facie case under *McDonnell-Douglas*, "the defendant bears the burden of producing a neutral explanation for its action, after which the plaintiff may challenge that explanation as pretextual." *Damiano v. Grants Pass Sch. Dist. No. 7*, 140 F.4th 1117, 1154 (9th Cir. 2025) (citation omitted).

Here, plaintiff pursues the first path to defeat summary judgment by pointing to "direct or circumstantial evidence" demonstrating that a discriminatory reason more likely than not motivated the employer. Dkt. No. 173 at 20-21; *see McGinest*, 360 F.3d at 1122. As direct evidence, plaintiff relies primarily on Washburn's statement at the December 8, 2021 meeting with plaintiff and MEBA representative Cimini, as corroborated by Cimini's deposition testimony, that Washburn "hoped Mr. Hunt would change his religious beliefs." Cherne Decl. ¶¶ 7, 9; Cimini Depo. at 140:1-13; Hunt Depo. at 213:4-6; *see Coghlan v. Am. Seafoods Co.,* 413 F.3d 1090, 1095 (9th Cir. 2005) ("Direct evidence typically consists of clearly sexist, racist, or similarly discriminatory statements or actions by the employer."); *Dominguez-Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 1038 (9th Cir. 2005) ("Direct evidence is evidence, which, if believed, proves the fact [of discriminatory animus] without inference or presumption.") (citation and internal quotation marks omitted). Plaintiff also testified

that Washburn repeated this comment at a second meeting on December 20, 2021. Hunt Depo. at 256:10-12, 257:1-9.[12] As circumstantial evidence, plaintiff points to Washburn's alleged refusal to consider any accommodations from the outset of the process.

Sunrise does not address the "direct or circumstantial evidence" path to establishing disparate treatment. Instead, Sunrise devotes the entirety of its briefing to the path plaintiff did not choose – the *McDonnell-Douglas* burden shifting analysis. *See* Mot. at 14-15; Reply at 2-14.[13] Moreover, Sunrise paints the adverse employment action plaintiff challenges as the LOU's vaccination requirement, but plaintiff alleges that Sunrise's adverse employment action was "threatening to terminate [plaintiff's] employment if he did not change his religious beliefs" and terminating Hunt's employment "because of his religion." *Compare id. with* TAC ¶¶ 68, 69, 119, 120.

Washburn's purported comments are barely mentioned in Sunrise's briefing. Sunrise asserts only that Mr. Washburn's comments were "mere thoughts or passing statements unrelated to the disputed employment decision" and thus insufficient to show that discrimination was a substantial motivating factor under FEHA. *See* Dkt. No. 196 at 9. (quoting *Harris v. City of Santa Monica*, 56 Cal. 4th 203, 232 (2013)). However, Washburn's comments plainly related to the disputed employment decision at issue.[14] Here, plaintiff presents evidence that Washburn authored the denial

[12] Plaintiff also relies on the Molinaro Declaration (Dkt. No. 172) to argue that statements or beliefs attributed to Pasha President and CEO, George Pasha, constitute direct evidence of animus. Dkt. No. 173 at 20. However, as discussed in the evidentiary objections section, *supra*, the Molinaro Declaration speculates about George Pasha's beliefs but does not indicate that George Pasha ever "stated" anything at all and is of dubious value.

[13] In responding to Sunrise's arguments under the *McDonnell-Douglas* framework, plaintiff argues he has presented evidence that Sunrise did allow other unvaccinated persons to work onboard its vessels and that, regardless, the Ninth Circuit does not require a plaintiff to identify a comparator in every disparate treatment case. Dkt. No. 173 at 20-21. The Court agrees that a plaintiff is not required to identify a comparator in every disparate treatment case. *See Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1158 (9th Cir. 2013) ("Our cases clearly establish that plaintiffs who allege disparate treatment under statutory anti-discrimination laws need not demonstrate the existence of a similarly situated entity who or which was treated better than the plaintiffs in order to prevail.").

[14] This Court acknowledges that the Ninth Circuit has upheld lower court determinations that comments by supervisors are insufficient to show evidence of discriminatory intent where, with another inferential step, the comments might indicate religious animus but more likely indicate an

United States District Court
Northern District of California

of plaintiff's religious exemption request finding plaintiff unfit for duty and made an unprofessional comment explicitly expressing a hope that plaintiff would change his religion during those proceedings. *See Dominguez-Curry*, 424 F.3d at 1038 ("Where a decisionmaker makes a discriminatory remark against a member of the plaintiff's class, a reasonable factfinder may conclude that discriminatory animus played a role in the challenged decision."); *Brown v. Alaska Airlines, Inc.*, 179 F.4th 707, 721 (9th Cir. 2026) ("[i]n view of [defendant's] involvement in the investigatory and disciplinary process, the arguably disparaging statements that allude to a protected ground support an inference of discrimination").

Therefore, the Court finds that plaintiff's evidence of Washburn's comment that he hoped plaintiff would change his religion, as corroborated by Cimini, is direct evidence of animus which creates a triable issue of fact. *See Godwin v. Hunt Wesson*, 150 F.3d 1217, 1221 (9th Cir. 1998)) (direct evidence of animus creates a triable issue "even if the evidence is not substantial"). Indeed, at the hearing, counsel for Sunrise confirmed that what Washburn said to plaintiff is a disputed factual issue. In sum, the Court DENIES Sunrise's motion for summary judgment on plaintiff's disparate treatment claims.

## IV. Claims II & VI: Religious Discrimination – Failure to Accommodate (Title VII and FEHA)

Sunrise moves for summary judgment on plaintiff's failure to accommodate claims. Dkt. No. 155. Plaintiff cross-moves for partial summary judgment against Sunrise as to establish his prima facie case of Sunrise's failure to accommodate his religious beliefs. Dkt. No. 154.

---

attempt to enforce a neutral policy. *See Cross v. Cent. Contra Costa Transit Auth.,* No. 21-CV-01312-JST, 2024 WL 6979681, at *3-4 (N.D. Cal. Sept. 3, 2024), aff'd, No. 24-6068, 2026 WL 92280, at *1 (9th Cir. Jan. 13, 2026) (finding statements by supervisor that plaintiff could not wear a hijab merely to be enforcing a no headwear dress code and not direct evidence of animus against the Muslim religion). However, this case is distinguishable because plaintiff presents evidence of a comment aimed explicitly at plaintiff's religion.

**A. Prima Facie Case**

To establish religious discrimination on the basis of a failure to accommodate theory under Title VII or FEHA, a plaintiff must first set forth a prima facie case that "(1) he had a bona fide religious belief, the practice of which conflicts with an employment duty; (2) he informed his employer of the belief and conflict; and (3) the employer discharged, threatened, or otherwise subjected him to an adverse employment action because of his inability to fulfill the job requirement." *Peterson v. Hewlett-Packard Co*., 358 F.3d 599, 606 (9th Cir. 2004) (citing *Heller v. EBB Auto. Co.,* 8 F.3d 1433, 1438 (9th Cir. 1993)).

Sunrise disputes whether plaintiff had a sincerely held religious belief that conflicted with Sunrise's Covid-19 vaccine requirement and whether plaintiff was subjected to an adverse employment action. Dkt. No. 170. It is undisputed that plaintiff informed Sunrise of his religious belief. *Id.* at 4, n.1.

**1. Sincerely Held Religious Belief**

In support of summary adjudication as to plaintiff's sincerely held religious beliefs, plaintiff offers his own deposition testimony that he has been an Orthodox Christian and has identified as such every day of his life since he was 10 years old. Dkt. No. 154-6 ("Hunt Depo.") at 43:6-25. Plaintiff further testified that his religious belief against abortion conflicted with getting the Covid-19 vaccination because he believes "there were actual fetal cells used in the vaccine" and that "God designed me for his purposes, so … these vaccines … created changes to God's plan." *Id.* at 233:19-234:9. Plaintiff's November 5, 2021, request for religious exemption to the Covid-19 exemption similarly explained that plaintiff believes that aborted fetal cells were used in the creation of Covid-19 vaccines and that Covid-19 vaccines would change his genetic makeup. Dkt. No. 154-4 at 19-36 (ECF pagination).

Plaintiff further argues that Sunrise already recognized that plaintiff's religious beliefs were sincere in Fleet Superintendent Captain Greg Johnson's November 9, 2021 letter responding to plaintiff's request for a religious exemption. Dkt. No. 154-4 at 38 (ECF pagination) ("We recognize that you have sincerely held religious beliefs that you feel would be violated were you to get a

United States District Court
Northern District of California

vaccine for Covid-19. Although Sunrise Operations is willing to provide you with an accommodation on the basis of your sincerely held religious beliefs, our options to grant such an exemption are restricted . . ."). Washburn and Johnson also testified during their depositions that they did not disbelieve plaintiff's sincerity. Dkt. No. 154-2 at 227:5-228:24; Dkt. No. 154-5 ("Johnson Depo.") at 148:8-14; 149:1-10).

The Court acknowledges that its limited "task is to decide whether the beliefs professed by [plaintiff] are sincerely held and whether they are, in his own scheme of things, religious." *U.S. v. Seeger*, 380 U.S. 163, 185 (1965). A plaintiff's "religious belief need not be consistent or rational to be protected under Title VII, and an assertion of a sincere religious belief is generally accepted." *Keene v. City & Cnty. of San Francisco*, No. 22-16567, 2023 WL 3451687, at *2 (9th Cir. May 15, 2023). The Ninth Circuit has stated that we "may not and do not question the legitimacy of [plaintiff's] religious beliefs regarding COVID-19 vaccinations." *Doe v. San Diego Unified Sch. Dist.*, 19 F.4th 1173, 1176 n.3 (9th Cir. 2021). However, "[t]his principle does not mean that courts must take plaintiffs' conclusory assertions of violations of their religious beliefs at face value." *Bolden-Hardge v. Office of California State Controller*, 63 F.4th 1215, 1223 (9th Cir. 2023): *see also*, *Detwiler v. Mid-Columbia Med. Ctr.*, 156 F.4th 886, 889-900 (9th Cir. 2025) (holding plaintiff's "references to prayer and a broad belief that her body is a temple" did not render her secular beliefs about nasal swabs in antigen tests religious).

The Court agrees with Sunrise that the religiosity and sincerity of plaintiff's beliefs is a jury question. Plaintiff submits his own self-serving testimony to establish his religious beliefs.[15] Sunrise points to evidence that may cast doubt on plaintiff's beliefs. For instance, Sunrise argues that plaintiff's "cut and paste explanation" of his religious beliefs from the internet provided in his

---

[15] The Court notes plaintiff also filed a statement of recent decision bringing the Court's attention to the case *Weiss v. The Permanent Medical Group, Inc.*, No. 24-6609, 2026 WL 2131748 (9th Cir. July 24, 2026) to support his motion for partial summary judgment. Dkt. No. 207. In *Weiss*, the Ninth Circuit reversed the district court's decision to grant an employer's motion to dismiss for failure to state a claim. This Court has reviewed the case and finds it unhelpful to its analysis. Unlike in *Weiss*, here the employer's notice of the conflict is undisputed and this Court considers plaintiff's bona fide religious belief on a motion for summary judgment not a motion to dismiss.

request for religious exemption demonstrates that plaintiff "went shopping for a religion online" so that he could avoid the vaccine "for secular reasons." Dkt. No. 170 at 5, 7-8; Dkt. No. 170-2. Sunrise also provides plaintiff's interrogatory responses which mention various churches plaintiff attended during his life but do not mention plaintiff's involvement in any "Orthodox" Christian churches. Dkt. No. 170-7; 170-8. Further, in response to one such interrogatory asking plaintiff to identify any religious institutions he attended during his employment with Sunrise, plaintiff identified only the "Highlands Vine (sic) Church" pastored by Mike and Beth Bricker. Dkt. No. 170-8 at 8. When deposed by defendants, Pastor Mike Bricker testified that plaintiff was not a member of his church (his church "technically" had no members); that plaintiff had only attended his church five or six times; that his church did not take a position one way or another on the Covid-19 vaccine[16]; that his church was not "Orthodox"; and that plaintiff did not seek religious advice from him, including about the Covid-19 vaccine. Dkt. No. 170-9 ("Bricker Depo.") at 11:10-13:4, 16:19-17:19. Nor does the Court find that Sunrise has waived its ability to contest this element of plaintiff's prima facie case because Washburn and Johnson did not dispute the sincerity of plaintiff's beliefs in denying his religious exemption request.

For the Court to determine that plaintiff's beliefs are religious and sincere, it would need to subjectively determine plaintiff's credibility and state of mind. A rational jury could find plaintiff did not have a sincerely held religious belief that conflicted with Sunrise's vaccine mandate. The Court DENIES plaintiff's motion for summary judgment as to this element of plaintiff's prima facie case.

**2. Adverse Employment Action**

Plaintiff argues that he has established that Sunrise subjected him to an adverse employment action because Sunrise told plaintiff he would lose his position as a permanent officer and no longer be able to sail on Sunrise vessels if he did not become fully vaccinated in its November 9, 2021

---

[16] Pastor Bricker also testified the following: "Q: Did you or your wife ever preach to your parishioners that they should not get the Covid vaccine for religious religions? A: No. We may very well have discussed some concerns we had regarding fetal cell lines being used, but we would not have advised people not to get it. We would want them to make an informed decision, but we aren't going to advise them one way or another." *Id.* at 17:7-14.



United States District Court
Northern District of California

letter. Dkt. No. 154 at 13; *see* Dkt. No. 154-4 at 38 (ECF pagination). Sunrise counters that a question of material fact remains because, though plaintiff was deemed "unfit for duty" under the CBA and was unable to sail, he was never officially terminated. Dkt. No. 170 at 6. According to Sunrise, plaintiff sought other employment through his union and then resigned. *Id.*

The Court agrees with plaintiff that losing the ability to maintain a permanent rotation is plainly an adverse employment consequence that directly affected the terms and conditions of plaintiff's work. *See* Dkt. No. 154 at 14. Regardless of when or how plaintiff was ultimately terminated, it is undisputed that plaintiff was found unfit for duty and could no longer sail for Sunrise. The Court is not persuaded by the three authorities Sunrise relies on for the general proposition that a voluntary resignation is not an adverse employment action, because here there is nothing on the record that demonstrates that plaintiff voluntarily resigned. *See Hammon v. DHL Airways, Inc.*, 165 F.3d 441 450 (6th Cir. 1999); *Hwang v. Nat'l Tech. & Eng'g Sols Of Sandia, LLC,* No. 20-CV-08551-SK, 2022 WL 3566444 (N.D. Cal. Aug. 18, 2022), aff'd, No. 22-16396, 2024 WL 208139 (9th Cir. Jan. 19, 2024); *Featherstone v. Southern California Permanent Medical Group*, 10. Cal.App.5th 1150, 1161 (2017). Accordingly, the Court GRANTS plaintiff's motion for summary judgment as to this element of plaintiff's prima facie case.

In sum, the Court GRANTS in part and DENIES in part plaintiff's motion for partial summary judgment.

**B. Employer's Defenses**

Once the plaintiff has established a prima facie case, the burden shifts to the employer to show that it "initiated good faith efforts to accommodate reasonably the employee's religious practices or that it could not reasonably accommodate the employee without undue hardship." *Peterson*, 358 F.3d at 606. (internal citation and quotation marks omitted). Sunrise barely attempts to argue that it has established undisputed evidence of a good faith interactive accommodation process, nor could it based on the on the record before the Court. As discussed below, the Court also finds that factual issues remain as to Sunrise's undue burden defense.

The undue hardship analysis requires "context-specific application." *Groff v. DeJoy*, 600 U.S. 447, 473, 143 S.Ct. 2279, 216 L.Ed.2d 1041 (2023). A religious accommodation poses an "undue hardship" when the accommodation "would result in substantial increased costs in relation to the conduct of [the employer's] particular business." *Id.* at 470. "[C]ourts must apply the test in a manner that takes into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost of an employer." *Id.* at 470-471 (cleaned up). The Ninth Circuit has considered "(1) health and safety costs, (2) operational burdens, and (3) financial burdens" to determine whether a defendant faced an undue hardship by accommodating a plaintiff's request for a religious exemption from the Covid-19 vaccine. *Petersen v. Snohomish Reg'l Fire & Rescue*, 150 F.4th 1211, 1218 (9th Cir. 2025). "[W]hen considering undue hardship in the context of COVID, employers should consider if the employee works in a solitary or group work setting, has close contact with other employees or members of the public, and works outdoors or indoors." *Id.* at 1220 (internal quotation marks and citation omitted).

Sunrise argues it was impossible for plaintiff to perform his job as an engineer remotely because he was required to lead the ship's engineering department of approximately 12 officers and crew and to perform maintenance and repair work, such that he must work and live aboard the ship. Dkt. No. 153-1 ¶ 3. While the Chief Engineer had a private office and cabin, he was still required to do hands-on work and interact with the crew. *Id.* ¶¶ 5-9.

Sunrise also presents evidence of the health and safety costs that having unvaccinated crew members at sea could pose. Washburn's declaration explains that a ship is a unique context "nothing like a house ashore" because doors and windows are generally closed for safety, the same air circulates throughout the ship, and crew are confined to common spaces, making social distancing impracticable. *Id.* ¶¶ 6-8. Further, while transiting at sea to and from Hawaii, the ship is regularly beyond range of medical attention or even evacuation by helicopter. *Id.* ¶ 36. Sunrise's retained expert, Dr. Brian Bourgeois, M.D., provides a declaration explaining that requiring Covid-19 vaccinations for those working in close quarters on an oceangoing vessel was the most effective means of preventing Covid-19 infection. Dkt. No. 153-4. Sunrise also presents evidence that under

the LOU between plaintiff's union and Sunrise, plaintiff's coworkers were entitled to work with vaccinated shipmates. Dkt. No. 153-1 ¶ 35; Dkt. No. 153-2.

Additionally, Sunrise presents evidence of considerable operational and financial burdens it would incur by accommodating plaintiff. Sunrise asserts that infections of Covid-19 would cause Sunrise to incur substantial costs for employee's medical treatments because Sunrise is responsible for providing "maintenance and cure" to seamen under federal maritime law. *Id.* ¶¶ 37-38. In addition to medical costs Sunrise would incur, Sunrise asserts it would incur "dockage fees" caused by delays at berth, as well as costs associated with loss of perishable food cargo that would become worthless if not delivered on time and the costs of providing food, electricity, and pay if the crew was quarantined at dock. *Id.* ¶¶ 37-38. Sunrise provides a declaration of its expert, Richard Timme, explaining the CDC's three options for vessel operators when Covid-19 was detected on a ship (crew change out, 14-day working quarantine, or temporarily discontinue operations) and the significant practical and operational hurdles these guidelines presented for ships with confirmed Covid-19 cases. Dkt. No. 153-5. Timme presents evidence that, as of September 23, 2021, ships with 100% fully vaccinated crew were exempt from these three options, thus avoiding these significant costs. *Id.* Sunrise also provides the report of a forensic accountant who calculated the financial costs of an actual July 2020 incident where a crew member on one of Sunrise's ships tested positive for Covid-19 while at sea, as well as potential costs to Sunrise had it experienced another Covid-19 outbreak at sea in 2021. Dkt. Nos. 196-1, 196-2.

Plaintiff cites a sentence from Sunrise's leading authority to suggest the hardships Sunrise would suffer if plaintiff became positive with Covid-19 while at sea are too speculative. Dkt. No. 173 at 19-20; *see Petersen*, 150 F.4th at 1221 (9th Cir. 2025) ("In general, we consider only actual hardships, not hypothetical ones when assessing undue hardship."). However, "an employer need not establish that an adverse health or safety event is *certain* to result from an accommodation to establish undue hardship under Title VII." *Bordeaux v. Lions Gate Ent., Inc.*, No. 23-4340, 2025 WL 655065, at * 2 (9th Cir. Feb. 28, 2025) (citing *See Bhatia v. Chevron U.S.A., Inc.*, 734 F.2d 1382, 1383-84 (9th Cir. 1984)) (per curiam). Thus, plaintiff's argument that Sunrise's undue

hardship is too speculative is not well taken, and the Court finds that Sunrise presents compelling evidence of financial burden.[17]

With this said, plaintiff provides sufficient evidence to create material disputes as to whether accommodating plaintiff would have been an undue burden on Sunrise. Plaintiff testified that his ability to perform his duties as Chief Engineer would not be heavily impacted if he had to quarantine in his stateroom. Washburn testified that Sunrise did not seek medical advice as to whether a single unvaccinated crew member working unvaccinated would pose a risk to other crew members. Plaintiff relies on testimony that other workers such as vendors, longshoremen, and pilots were not required to be vaccinated. Plaintiff's rebuttal expert Dr. Mina suggests that "layered mitigation – including pre-boarding testing, day-of testing, serial testing, masking or respirator use . . . etc." could reduce Hunt's transmission risk to a level comparable to or even lower than vaccinated but untested crew members. Dkt. No. 173-3. Plaintiff's rebuttal expert Captain Arthur J. Weis opines that replacing a single unvaccinated crew member under CDC's Option # 1 (as amended in September 2021) would not be an operational catastrophe or present an undue burden. Dkt No. 173-4. Indeed, plaintiff provides evidence that crew changeouts were a regular occurrence aboard Sunrise vessels. Taken as true, these and other factual issues preclude summary adjudication.

While *Petersen* affirmed the district court's summary judgment decision in favor of the employer on the issue of undue burden in the Covid-19 context, the Court agrees with plaintiff that this case is distinguishable. In *Petersen*, the Ninth Circuit explained that plaintiffs' assertions that they were able to safely perform their job without vaccinations were unsupported by any medical evidence. *See* 150 F.4th 1211 at 1220 ("The objective, unrebutted medical evidence shows that [defendant] would have faced significant health and safety costs by allowing unvaccinated firefighters to continue working, even with accommodations."). *Petersen* cautions courts against judging defendants "with the clarity of hindsight or the benefit of post-pandemic debates over what

---

[17] In its reply brief, Sunrise relies on *Hall v. Sheppard Pratt Health Sys.,* 155 F.4th 747, 753-54 (4th Cir. 2025) to argue that the possibility of a single unvaccinated individual getting others sick is a non-speculative risk that supports a finding of undue hardship in the Covid-19 context. Dkt. No. 196 at 4-5. Sunrise miscites this case as Ninth Circuit precedent, but the Court notes it is a Fourth Circuit opinion. *See* Dkt. No. 196 at 5, n. 12.

measured responses frontline employers should have taken." *Id.* at 1222; *see also Williams v. Legacy Health*, 174 F.4th 1201, 1206 (9th Cir. 2026) (considering what evidence was available to the employer at the time to determine if the undue hardship standard was satisfied). Here, however, Sunrise's evidence of health and safety and operational costs is controverted by both lay and expert testimony based on information that may have been available to Sunrise at the time of its decision to deny plaintiff's religious accommodation request.

The Court has also reviewed the Ninth Circuit's recent decisions in *Duden v. State of Washington*, No. 25-724, 2026 WL 2334324 (9th Cir. Aug. 12, 2026) and *Nilsen v. University of Washington*, No. 24-7460, 2026 WL 2352904 (9th Cir. Aug. 13, 2026). In each case the Ninth Circuit upheld the district court's grant of summary judgment on a defendant's undue hardship defense in the Covid-19 vaccination context. The Court finds each case to be distinguishable from the present case, both in terms of context and in terms of the amount of disputed evidence. In *Duden*, the Ninth Circuit reasoned that plaintiff did not rebut the Department of Correction's evidence that plaintiff's job teaching inmates at a high-security prison required in person administration, that it received approximately 600 requests for religious exemptions, or that Covid-19 infections rates among staff increased significantly in the months leading up to the vaccine mandate. Here, Sunrise received at most 2 requests for religious exemptions and plaintiff disputes how much in person contact was required to perform his job. In *Nilsen*, the Ninth Circuit found that an expert report regarding prevention of Covid-19 relying largely on data that was published after the disputed accommodation decisions were made was insufficient to create a genuine dispute of material fact, where defendants had relied on a special committee of medical experts from the University of Washington Medical School to determine the risks of having unvaccinated medical employees in healthcare facilities. Here, plaintiff's experts rely on information that may have been available to Sunrise at the time of its adverse employment decision. Furthermore, the prison and healthcare contexts differ considerably from the context here.

Counsel for Sunrise argued at the hearing that the "extreme" setting of a ship counsels in favor of an undue hardship finding. While the Court is sympathetic to Sunrise's argument, the Court finds that numerous factual disputes remain as to whether providing a single religious

accommodation to the Covid-19 vaccine to plaintiff would have created an undue burden for Sunrise in the unique context of the shipping industry. As such, the Court DENIES Sunrise's motion for summary judgment on plaintiff's failure to accommodate claims.

**V. Claims III & VII: Retaliation (Title VII and FEHA)**

Sunrise moves for summary judgment on plaintiff's third and seventh claims for "Retaliation" under Title VII and FEHA. Dkt. No. 155 at 16-17. Plaintiff alleges that Hunt "engaged in a protected activity by requesting religious accommodation not to receive the Covid-19 vaccine" and that "defendants subjected Hunt to an adverse employment action by threatening him with termination if he didn't change his beliefs, and terminating his employment." TAC ¶¶ 97, 98, 143, 144.

To determine retaliation claims brought under Title VII and FEHA, courts apply the *McDonnell Douglas* burden-shifting framework. *See Porter v. Cal. Dep't of Corrs.*, 419 F.3d 885, 894 (9th Cir. 2004); *Loggins v. Kaiser Permanent Int'l*, 151 Cal. App. 4th 1102, 1108-09 (2007). To make out a prima facie case of retaliation, plaintiff must show that: (1) he engaged in protected activity, (2) his employer subjected him to an adverse employment action, and (3) a causal link exists between the protected activity and the adverse action. *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000). If a plaintiff has asserted a prima facie retaliation claim, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for its decision. *Id.* at 1464-1465. If the defendant articulates such a reason, the plaintiff bears the ultimate burden of demonstrating that the reason was merely a pretext for a discriminatory motive. *Id.*

Sunrise does not appear to dispute that plaintiff has established the first two elements of his retaliation claim. Rather, Sunrise argues that plaintiff cannot establish causation where a vaccine mandate is neutrally imposed and clearly states termination is a consequence of failing to comply with the mandate. Dkt. No. 155 at 17. Sunrise is correct that "[s]everal courts have found that a plaintiff cannot establish causation where a vaccine mandate is neutrally imposed and clearly states that termination is a consequence of failing to comply with the mandate." *Allbright v. S. California Permanente Med. Grp. Inc.,* 793 F. Supp. 3d 1214 (C.D. Cal. 2025), appeal dismissed sub

nom. *Allbright v. S. California Permanente Med. Grp.,* No. 25-5426, 2025 WL 4354257 (9th Cir. Dec. 29, 2025) (collecting cases). However, *Allbright* and the collected cases it refers to differ from the present case because, here, plaintiff points to an explicit discriminatory statement by his employer.

Both in its briefing and at the hearing, Sunrise takes the position that plaintiff's evidence regarding Washburn's statements at his December 8 and 20, 2021 meetings with Washburn cannot be evidence of pretext because they occurred long after the overarching vaccination policy was established by the LOU and "**after** the employment decision had been made, which for [p]laintiff, occurred in November 20[21]."[18] Dkt. No. 196 at 9. The Court disagrees. The general vaccination policy is not at issue, rather plaintiff challenges Sunrise's treatment of his individual request for religious exemption. It is true that Sunrise initially sent plaintiff a letter denying his request for religious exemption on November 9, 2021. Dkt. No. 154-4. However, the final determination that plaintiff was not fit for duty was not sent to plaintiff until February 7, 2022, after Washburn made a statement suggesting plaintiff should change his religious beliefs and refused to consider plaintiff's various accommodation proposals. *See* Dkt. No. 174-4. Viewed in the light most favorable to plaintiff, a reasonable jury could find that Sunrise retaliated against plaintiff because he did not change his religious beliefs, as Washburn explicitly requested.

Thus, the Court DENIES Sunrise's motion for summary judgment on plaintiff's retaliation claims.

## VI. Claim IV: Religious Coercion – Harassment (Title VII)

Sunrise moves for summary judgment on plaintiff's fourth claim for religious harassment under Title VII. Dkt. No. 155 at 17-18. The parties agree that there are two theories of discrimination in the form of harassment: *quid pro quo* or hostile work environment. *See Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000) (discussing sexual harassment under Title

[18] Sunrise's briefing states that the date of the relevant employment decision was November 2022. The court assumes this was in error and that Sunrise is referring to the initial letter denying plaintiff's request for exemption dated November 9, 2021.

VII). In the sexual harassment context, a *quid pro quo* claim under Title VII arises "when a supervisor demands sexual favors in return for a job benefit." *Brooks v. City of San Mateo,* 229 F.3d 917, 923 (9th Cir. 2000) (discussing sexual harassment under Title VII). In a recent unpublished decision, the Ninth Circuit stated in a footnote that "the theory of quid pro quo harassment in the context of religious discrimination . . . essentially occurs 'when a supervisor demands that an employee alter or renounce some religious belief in exchange for job benefits.'" *Cross v. Cent. Contra Costa Transit Auth.,* No. 24-6068, 2026 WL 92280, at *3 n.1 (9th Cir. Jan. 13, 2026) (quoting *Weiss v. United States*, 595 F. Supp. 1050, 1056 (E.D. Va. 1984) (citing *Katz v. Dole*, 709 F.2d 251 (4th Cir. 1983))).

Sunrise argues that plaintiff has no evidence to support any intent or animus against his religion to support a *quid pro quo* theory. *Id*.[19] The Court disagrees, finding that this claim also turns on evidence that Washburn told plaintiff he hoped he would change his religion, suggesting a representative for defendants told plaintiff point blank that he hoped plaintiff would change his religious beliefs so that plaintiff would not be terminated. Plaintiff's union representative has corroborated one of these incidents. A jury could conclude this was a demand in exchange for job benefits. Accordingly, this case is distinguishable from Judge Tigar's recent decision granting summary judgment in favor of an employer charged with religious discrimination. *See Cross v. Cent. Contra Costa Transit Auth.,* No. 21-cv-01312-JST, 2024 WL 6979681, at *6 n.4 (N.D. Cal. Sept. 3, 2024), aff'd, No. 24-6068, 2026 WL 92280 (9th Cir. Jan. 13, 2026). There, the employer granted the plaintiff's request for a religious exemption from the employer's uniform policy so she could wear a hijab at work, and no evidence suggested that the plaintiff's employment was conditioned on her not wearing a hijab. *Id.*

However, the Court does find that plaintiff's hostile workplace theory cannot survive

[19] Sunrise also argues that there is no authority establishing that *quid pro quo* religious harassment is a viable legal theory of recovery in the Ninth Circuit. Dkt. No. 155 at 17-18. While Sunrise is correct that the Ninth Circuit has not expressly recognized a *quid pro quo* theory of Title VII harassment in the religious context, neither has the Ninth Circuit disavowed it. The Court incorporates by reference its discussion in its order denying defendants' motion for judgment on the pleadings. Dkt. No. 203 at 2-6.

summary judgment based on the record before the Court. To prevail on a hostile work environment claim, plaintiff must establish that the workplace was permeated with "discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc,* 510 U.S. 17, 21 (1993). Here, no reasonable jury could conclude that plaintiff was subjected to a hostile work environment because two offhand comments do not constitute pervasive or severe conduct, and plaintiff neither alleges nor provides evidence of any other pervasive or severe harassing conduct.

Therefore, the Court DENIES Sunrise's motion for summary judgment as to plaintiff's *quid pro quo* religious harassment claim, but GRANTS it as to plaintiff's hostile work environment claim.

**VII. Punitive Damages**

Sunrise moves for summary judgment on plaintiff's request for punitive damages on his Title VII claims. Dkt. No. 155 at 19-20. Under Title VII, as amended, a plaintiff may recover punitive damages where an employer has acted with "malice or reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). As the Supreme Court explained in *Kolstad v. American Dental Association*, the reckless indifference standard requires that "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages." 527 U.S. 526, 536, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999).

Sunrise argues that plaintiff cannot demonstrate by clear and convincing evidence that defendant engaged in a discriminatory practice with malice or recklessness. Dkt. No. 155 at 19. Sunrise contends that its vaccination policy was to protect employees from danger and that it "carefully considered" plaintiff's request for religious accommodation. *Id.* at 19-20. However, given Washburn's comment and the record before the Court, a reasonable jury could find Sunrise's conduct to demonstrate malice or recklessness. The Court therefore DENIES Sunrise's motion for summary judgment on the issue of punitive damages.

**VIII. Defendant Pasha's Motion for Summary Judgment**

United States District Court
Northern District of California

Defendant Pasha moves for summary judgment as to all of plaintiff's claims on the grounds that Pasha is a parent corporation of Sunrise that never employed plaintiff. Dkt. No. 152 at 2. Liability under Title VII and FEHA depends on the existence of an employment relationship. *See* 42 U.S.C. § 2000e-2(a); Cal. Gov't Code § 12940; *U.S. Equal Emp. Opportunity Comm'n v. Glob. Horizons, Inc.*, 915 F.3d 631, 637 (9th Cir. 2019); *Vernon v. State of California*, 116 Cal. App. 4th 114, 123 (2004).

Title VII "recognizes that two entities may simultaneously share control over the terms and conditions of employment, such that both should be liable for discrimination relating to those terms and conditions." *Global Horizons*, 915 F.3d at 637. In *Global Horizons*, the Ninth Circuit adopted a common-law agency test to determine whether an entity is a joint employer under Title VII. *Id.* at 638-39. The "'principal guidepost' is the element of control—that is, 'the extent of control that one may exercise over the details of the work of the other.'" *Id.* at 638 (quoting *Clackamas Gastroenterology Associates, P.C. v. Wells*, 538 U.S. 440, 448 (2003)). A district court is to consider a non-exhaustive list of factors to determine whether control exists:

> the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Id.* (quoting *Nationwide Mutual Insurance Co. v. Darden*, 503 U.S. 318, 323-24 (1992)). "There is 'no shorthand formula' for determining whether an employment relationship exists, so 'all of the incidents of the relationship must be assessed and weighed with no one factor being decisive.'" *Id.* (quoting *Darden*, 503 U.S. at 324). However, "even if a joint-employment relationship exists, one joint employer is not automatically liable for the actions of the other." *Id.* at 641. "Liability may be imposed for a co-employer's discriminatory conduct only if the defendant employer knew or should have known about the other employer's conduct and failed to undertake prompt corrective measures within its control." *Id.* (internal quotation marks and citation omitted); *see also, Watson*

*v. Gulf & Western Industries,* 650 F.2d 990, 993 (9th Cir. 1981) ("[i]n the absence of special circumstances, a parent corporation is not liable for the Title VII violations of its wholly owned subsidiary").

FEHA requires some connection with an employment relationship, but "the connection need not necessarily be direct." *Vernon*, 116 Cal. App. 4th at 123. California courts have used various tests to determine whether an employment relationship exists, but "[t]he common and prevailing principle espoused in all of the tests directs [courts] to consider the 'totality of the circumstances' that reflect upon the nature of the work relationship of the parties, with emphasis upon the extent to which the defendant controls the plaintiff's performance of employment duties." *Id.* at 124.

Pasha argues that it is not plaintiff's joint employer because it does not hire, pay, or manage plaintiff or any vessel crews. Dkt. No. 152 at 2; Dkt. No. 150-1 ¶ 5. As support, Pasha points to a July 24, 2018 assignment letter assigning plaintiff to the position of Permanent Chief of Engineer on the SS Horizon Pacific in July 2018. Dkt. No. 152-2, Ex. B. The assignment letter is on Sunrise letterhead. *Id.* Pasha also argues that Sunrise, not Pasha, is party to collective bargaining agreements with MEBA, which provide the terms of employment for engineers like plaintiff.

Plaintiff's opposition does not fully dispute this. Plaintiff instead argues that the record does not support Pasha's "attempt to isolate Hunt's employment within a single Sunrise 'silo'" because Pasha-affiliated entities and personnel participated in functions related to Hunt's employment. Plaintiff's main argument is that a reasonable jury could find that Pasha participated in or influenced the vaccination accommodation policy and decision at issue. Dkt. No. 192 at 7-8. Plaintiff relies principally on testimony that Pasha handled all <u>non-union</u> exemption requests from Pasha's subsidiaries and on Pasha's September 2021 vaccination policy for non-union employees. However, it is undisputed that this policy did not apply to plaintiff.

Plaintiff also argues that Washburn's possible participation on a companywide Covid-19 Strategic Response Team could show Pasha was involved in Hunt's religious exemption request denial. But the record does not reflect that the Strategic Response team had any hand in approving or denying any employee request. Moreover, there is no evidence that Washburn participated in those meetings, and deposition testimony from Washburn and the head of that committee indicate

that he did not. Plaintiff also argues that the proximity of George Pasha's office to Washburn's office suggests a joint employer relationship.

Plaintiff does not provide any other evidence that Pasha controlled plaintiff's employment, the key consideration under both FEHA and Title VII.[20] Therefore, plaintiff does not present evidence of control to create a factual dispute that Pasha may be Hunt's joint employer. *See Anderson*, 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party].")

Accordingly, the Court GRANTS summary judgment in favor of Pasha.

**CONCLUSION**

For the foregoing reasons and for good cause shown, the Court hereby GRANTS IN PART and DENIES IN PART plaintiff's motion for partial summary judgment on Claims II and VI. Dkt. No. 154. The Court finds that plaintiff has established his prima facie case of Sunrise's failure to accommodate his religious beliefs as to the adverse employment action and notice elements, but not as to the sincerely held religious belief element. The Court DENIES Sunrise's motion for summary judgment on all claims except plaintiff's religious harassment/hostile work environment claim, as to which summary judgment is GRANTED. The Court GRANTS Pasha's motion for summary judgment on all claims and dismisses Pasha from this case. The Court DENIES defendants' motion to exclude plaintiff's expert Dr. Mina.

///

[20] Plaintiff also relies on the Molinaro Declaration (Dkt. No. 172) to argue George Pasha orchestrated Sunrise's vaccination and accommodation policy. Dkt. No. 173 at 20. However, as discussed in the evidentiary objections section, *supra*, the Court finds that the declaration alone cannot create a material factual dispute as to whether Pasha jointly employed plaintiff.

This case will proceed to trial. The pretrial conference is scheduled for September 22, 2026, and trial is set to begin on October 5, 2026.

**IT IS SO ORDERED.**

Dated: August 21, 2026

SUSAN ILLSTON
United States District Judge

United States District Court
Northern District of California